UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-24168-CIV-SCOLA/GOODMAN

KEVIN KARPEL,

      Plaintiff,

v.

KNAUF GIPS KG, et al.,

      Defendants.

_____/

## ORDER ON DEFENDANTS' *DAUBERT* MOTION

Plaintiff Kevin Karpel, a south Florida homeowner, along with other Plaintiffs in the Related Cases[1] (collectively, Plaintiffs) filed suit against Defendants Kanuf Gips KG and Knauf New Building System (Tianjin) (collectively, "Knauf" or "Defendants"), asserting the following claims: negligence (Count I), negligence per se (Count II), strict liability (Count III), breach of express and/or implied warranty (Count IV), private

---

[1]     There are 23 related and companion cases, and they all levy similar allegations against Defendants: Case No. 21-cv-24168-RNS; Case No. 21-cv-24171-RNS; Case No. 21-cv-24172-RNS; Case No. 21-cv-24179-RNS; Case No. 21-cv-24181-RNS; Case No. 21-cv-24186-RNS; Case No. 21-cv-24188-RNS; Case No. 21-cv-24191-RNS; Case No. 21-cv-24192-RNS; Case No. 21-cv-24196-RNS; Case No. 21-cv-24200-RNS; Case No. 21-cv-24201-RNS; Case No. 21-cv-24202-RNS; Case No. 21-cv-24204-RNS; Case No. 21-cv-24206-RNS; Case No. 21-cv-24208-RNS; Case No. 21-cv-24210-RNS; Case No. 21-cv-24211-RNS; Case No. 21-cv-24213-RNS; Case No. 21-cv-24214-RNS; Case No. 21-cv-24216-RNS; Case No. 21-cv-24215-RNS; and Case No. 21-cv-24217-RNS.

nuisance (Count V), negligent discharge of a corrosive substance (Count VI), unjust enrichment (Count VII), and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VIII). [ECF No. 5]. Following the District Court's Orders on Defendants' summary judgment motion [ECF Nos. 58; 70], only the following counts remain: negligence (Count I), strict liability (Count III), breach of express and/or implied warranty (Count IV),[2] and unjust enrichment (Count VII).[3]

Defendants filed a *Daubert*[4] motion, which seeks to exclude or limit the testimony of two of Plaintiffs' experts, Howard Ersham and Shawn Macomber. [ECF No. 64].[5] Plaintiffs filed a response [ECF No. 73] and Defendants filed a reply [ECF No. 78]. United States District Court Judge Robert N. Scola referred to the Undersigned the motion "to be heard and determined, consistent with 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of the Local Magistrate Judge Rules." [ECF No. 66]. 28 U.S.C. § 636(b)(1)(A) concerns non-dispositive motions, which means the Undersigned may

---

[2]     This Count remains for only the Blonsky Plaintiffs in Case No. 21-cv-24214-RNS.

[3]     This Count remains for only the Blonsky Plaintiffs in Case No. 21-cv-24214-RNS.

[4]     *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

[5]     Although this motion was filed in only the instant case, the issues concern all 23 of the Related Cases. [ECF No. 64]. To avoid duplicative pleadings, the Court instructed the parties to file all motions which address issues shared by the Related cases in only the instant case and to file in the other cases only case-unique motions. [ECF No. 21].

issue an Order (as opposed to a Report and Recommendations).

For the reasons discussed in greater detail below, the Undersigned **grants** Defendants' Motion.

## Overall Background

On June 15, 2009, the United States Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, established MDL No. 2047 in the Eastern District of Louisiana. *In re: Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (U.S. Jud. Pan. Mult. Lit. 2009). The cases centralized under section 1407 all "share[d] factual questions concerning drywall manufactured in China, imported to and distributed in the United States, and used in the construction of houses; plaintiffs in all actions allege that the drywall emits smelly, corrosive gases." *Id.* at 1347. The Related Cases concern the same type of core factual allegations.

Initially, in 2014, the Related Cases were filed as a single class action in the Northern District of Alabama. [Case No. 21-cv-23442, ECF No. 1]. The Northern District of Alabama Clerk transferred the class action to the Eastern District of Louisiana to be heard as part of the established MDL. [Case No. 21-cv-23442, ECF No. 5]. Nearly seven years later, the MDL court advised the Judicial Panel on Multidistrict Litigation that coordinated and consolidated pretrial proceedings had been completed and that remand

to the transferor court was appropriate. [Case No. 21-cv-23442, ECF No. 7]. Once the class action was remanded to the Northern District of Alabama, the district court severed the counts and held that it would "retain jurisdiction over plaintiffs with affected property in the Northern District of Alabama and transfer cases involving property outside of this district to the appropriate districts where the property is located pursuant to 28 U.S.C. § 1404." [Case No. 21-cv-23442, ECF No. 26]. Following this Order, the Related Cases were transferred to the Southern District of Florida.

Despite the more-complex-than-usual *procedural* history, the facts of these cases are simple. As explained by the District Court, "[t]he facts here are straightforward. [Defendants] are foreign manufacturers accused of constructing defective drywalls that have been installed in homes across the country. [Plaintiffs] in the Related Cases own such homes." [ECF No. 58].

Plaintiffs listed two experts in support of their claims. The first, Howard Ehrsam, the President of Chinese Drywall Screening, LLC, offers opinions concerning the corrosiveness of Knauf-Tianjin (KPT) drywall. [ECF No. 64-2]. The second, Shawn Macomber, a defective drywall consultant and remediator, inspected the properties for the presence of certain types of drywall and opines on the cost of a full remediation of the home. [ECF No. 64-3]. Defendants challenge the reliability and helpfulness of both experts' opinions. [ECF No. 64].

## I.      LEGAL FRAMEWORK

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert*, 509 U.S. at 582 and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d

at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) (en banc). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id.* at *7 (quoting *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d 1300 (affirming summary judgment in favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink*, 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier*, 387 F.3d 1244 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

8

## II.      ANALYSIS

Plaintiffs allege that Defendants have made two omissions in their recitation of the *Daubert* standard. They say that these omissions concern important qualifiers to the *Daubert* framework. Thus, before turning to Defendants' issues with each expert, the Undersigned will address the purported omissions.

First, Plaintiffs find it necessary to note that *Daubert* -- a case whose name has become the widespread moniker for motions seeking to challenge the admissibility of an opposing party's expert's testimony -- was decided in the context of toxic tort litigation. [ECF No. 73]. Plaintiffs claim that the most pressing "policy concern" in that case was "that juries would be misled by experts offering novel, untested theories, or even 'junk sciences.'" *Id.* The seeming takeaway of this argument is that because this case does not involve toxic tort litigation, that policy concern is not present. This is not accurate. The purpose of *Daubert* is to ensure that unqualified experts, unreliable opinions, or irrelevant expert testimony is not presented to the factfinder -- regardless of the nature of the case.

The second omission that Plaintiffs allege that Defendants made is that "[a]lthough *Daubert* also applies in bench trials, the concern that the fact-finder will be misled there carries little weight." [ECF No. 73 (citing *Volk v. United States*, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999) for the proposition: "[I]t bears noting that the *Daubert* gatekeeping obligation is less pressing in connection with a bench trial.")]. Plaintiffs go

on to argue that "in a bench trial, probing the nitty gritty of experts' methodologies under *Daubert* to avoid misleading the court may not be an efficient use of judicial or party resources, because the court can simply hear the testimony and give it the weight it deserves." *Id.* Certainly, this principle is true. However, unless the parties later stipulate otherwise, this case will be heard by a jury. Indeed, Plaintiffs seem aware of this fact. [ECF No. 73 (claiming that certain testimony "would be both relevant and probative to a *jury . . .*" (emphasis added))]. Thus, this principle of law is currently irrelevant to the instant *Daubert* discussion.

Accordingly, the Undersigned finds that neither of these purported omissions will impact the analysis of Defendants' contention that Ehrsam and Macomber's opinions are unreliable and unhelpful.

a.  <u>Howard Ehrsam</u>

Ehrsam is president of Chinese Drywall Screenings. [ECF No. 64-2]. Plaintiffs retained him to offer the following "generic expert opinions": (1) Whether defective Knauf drywall produces gasses and what gasses are emitted; (2) Whether defective Knauf drywall off-gassing causes corrosion in the home and the extent of that corrosion; (3) Whether defective Knauf drywall causes damages to components in a home and which typical components (wiring, plumbing, a/c, etc.); (4) Whether defective Knauf drywall causes damage to personal property in the home and which items or contents are affected

10

(computers, televisions, etc.); and (5) Explain the difference between defective Knauf drywall and domestic-made drywall and the off-gassing that has been known to occur by each. *Id.*

Defendants characterize Ehrsam's opinion as being only that "uppercase KPT has the tendency to emit gases and it can cause corrosion and/or damage to component parts in homes." [ECF No. 64, p. 2]. Plaintiffs do not dispute this characterization in their response. Moreover, it is consistent with the "summary and conclusion" section of Ehrsam's report. [ECF No. 64-2].

Defendants' challenges to Ehrsam's opinion are that:

> Mr. Ehrsam seeks to offer **general** testimony regarding the tendency for "uppercase" KPT drywall to emit sulfur and/or corrode materials. By his own admission, Mr. Ehrsam's **generic** opinions are speculative and unreliable as to *individual* properties, and nonetheless are irrelevant and unhelpful to the trier of fact on issues regarding *individual* causation and damages in the Related Cases.

[ECF No. 64 (emphasis added)].

Defendants' reliability and relevance arguments both stem from Ehrsam's admission that there are many other relevant factors which could impact the corrosiveness of the KPT drywall and Ehrsam's inability to say whether those factors are present in any of the Related Cases because he did not examine any of the homes.

First, Defendants claim that Ehrsam's opinions are unreliable because he is unable to offer any insight into whether the properties suffered damage due to uppercase KPT

11

drywall. At most, Defendants say, Ehrsam opines that it is *possible* for uppercase KPT

drywall to cause corrosion. Defendants argue that this is problematic because Ehrsam

admits that many other factors are relevant to determining whether uppercase KPT

drywall caused any damage. As support, Defendants cite to the following deposition

exchanges:

> Q. Whether there is any corrosive effects and the severity of those effects
> will depend on the type of drywall, true?
> A. Yes.
> Q. Whether there is a mix of corrosive and non-corrosive drywall?
> A. Yes.
> Q. And, ultimately, the amount -- the amount of Chinese drywall that is
> corrosive in the property?
> A. Yes.
>
> ***
>
> Q. And then whether and the extent of corrosion in a property may also be
> due to other factors in the environment besides the drywall itself, true?
> A. True.
> Q. So, for example, if you have a property that is on the coast, if there is
> certain pitting, and when I say "the coast," I'm speaking the coast, Gulf of
> Mexico or the ocean, Atlantic Ocean, if there is certain pitting of personal
> property items, could that be a result of either corrosive drywall or the fact
> that it's in a salty air environment?
> A. The characteristics are different, but, yes, the **salty air environment does
> cause corrosion**.
>
> ***
>
> Q. Other environmental factors other than corrosive Chinese drywall may
> result in the blackening of certain copper items?
> A. There are other things that can cause blackening, correct.
> Q. And what sources other than corrosive drywall can result in blackening

of copper components?

A. The most common is improperly treated well water; however, there are other things. **It could be chemicals introduced by the homeowner. It could be dried traps, sewer gas, natural gas leaks, various chemicals that are stored in proximity to the affected items, natural subterranean gas emissions coming from the ground**.

Q. Could it also be -- other than coming from the ground, if you lived in a -- for lack of a better term -- lived in a swampy area where sulfur gas is common, could that also be a factor in terms of weather and the extent of the type of corrosion in a property?

A. Theoretically, yes.

\*\*\*

Q. And in terms of all these things, and corrosive Chinese drywall, because you have all those factors, how do you determine or rule out those factors?

A. We take everything in consideration.

Q. And I guess I'm trying to just ask the -- the simplest form of the answer is that you do an inspection; is that right?

A. Correct.

\*\*\*

Q. Can you -- you cannot state with any degree of certainty that those secondary impacts that you've seen in the past also apply with respect to the individual plaintiffs in this case, true?

A. I guess.

Q. My point is that it can potentially apply, but you can't --

A. But I can't state with certainty, true.

**Q. In fact, everything, in terms about your scientific opinions, you can't even say whether it's more likely than not, true?**

**A. True.**

\*\*\*

Q. Okay. Again, my question is in terms of these items, or any item, you can't determine whether an item is impacted by corrosive Chinese drywall without having physically inspected that item or viewing it; is that

13

accurate?
A. True.

[ECF No. 64 (citing ECF No. 64-1) (emphasis added)].

In summary, during his deposition, Ehrsam admitted that corrosion can be caused by factors independent from uppercase KPT drywall, such as untreated well water, various chemicals, salt water, sewer gas, sulfur air, etc. Ehrsam also admitted that corrosion can be caused by other types of drywall. Finally, Ehrsam stated that he cannot with scientific certainty state whether the secondary impacts of KPT drywall exist with respect to Plaintiffs in the Related Cases, nor could he even say whether it was "more likely than not."

Based on this, Defendants say that Ehrsam's opinion is unreliable because "[a]t best, Mr. Ehrsam is offering an opinion that 'generically speaking' if there is corrosion reported in any of the properties owned by a Plaintiff in the Related Cases, that corrosion was possibly caused by KPT drywall." [ECF No. 64, p. 12.]. Defendants go on to state that "[b]ecause Plaintiffs will be required at trial to prove specific and individual causation and damages, a general opinion that KPT drywall emits gas and causes corrosion without any correlation to the drywall or damage in any of Plaintiffs' properties is unhelpful and usurps the jury's role as a factfinder." *Id.* at 13.

As noted above, Defendants' myriad challenges to the admissibility of Ehrsam's opinion focus exclusively on the reliability of the opinion as well as its helpfulness to the

jury (i.e., Defendants do not challenge Ehrsam's qualifications). Despite this, much of Plaintiffs' response focuses on Ehrsam's qualifications and experience. The brevity of Plaintiffs' response to the pertinent issues makes summarizing their argument unnecessary; simply quoting the entirety of the argument will have the same effect:

> Mr. Ehrsam's opinions regarding the general damage (i.e., corrosion) are relevant and probative to these cases. His general opinions are based on his personal experience with the homes containing the defective Knauf drywall. Defendants have stipulated on multiple occasions that their drywall (the all-capital "KNAUF" board at issue in all of these cases and found in all Plaintiffs' homes) indeed produces reduced sulfur gases that cause corrosion. Thus, the production of corrosive gas by Defendants' product is not in dispute and the corrosion it causes within a home containing the defective drywall would be both relevant and probative to a jury considering the appropriate damages to reward Plaintiffs.

[ECF No. 73, pp. 11-12 (footnote in original removed)].

Qualifications are a distinct factor in the *Daubert* analysis. Indeed, a court must be careful not to conflate an expert's satisfactory qualifications with the reliability of the expert's opinions. Although there is overlap between the two factors, they are distinct in their function. The Eleventh Circuit has summarized this interplay as follows:

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. ... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1241-42. Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important

requirement for admissibility.

*Frazier*, 387 F.3d at 1261.

"The proponent of expert testimony always bears 'the burden to show that his expert is qualified to testify competently regarding the matters he intend[ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact.'" *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257 (alterations in original)).

Here, Plaintiffs have fallen well short of their burden on the requirements other than qualifications.

Plaintiffs offer no explanation or law supporting their contention that Ehrsam's opinions are relevant to the appropriate damages to award. Ehrsam's own admissions -- that he did not inspect any of the properties and cannot offer any damages-based opinions -- run contrary to Plaintiffs' unelaborated position. At most, it could be argued that Ehrsam's opinions are relevant to liability (even though Plaintiffs do not actually raise this argument in their response). However, the many qualifying factors in which Ehrsam couches his opinions -- as noted by Defendants in their citations to the deposition transcript -- undermine the reliability of any liability-based opinion.

The Eleventh Circuit's discussion in *Frazier*, 387 F.3d at 1264 is instructive. In *Frazier*, the Eleventh Circuit affirmed the trial court's decision to exclude the defendant's

16

expert's opinion that "the recovery of inculpatory hair or seminal fluid 'would be expected.'" The Court found that the lack of specificity surrounding the phrase "would be expected" was problematic, stating:

> Whether Tressel opined that "expect," as he used the term, meant that it was more likely than not that trace evidence would be found, or that it was substantially more likely than not that it would be found if there was a sexual assault, or that discovery was a virtual certainty, is altogether unclear from Tressel's report or his testimony. The specific meaning of the opinion is impossible to discern. As the government pointed out at oral argument, even the dictionary definition of the term "expect"—meaning to consider something either likely or certain—is itself ambiguous, and could imply a likelihood anywhere between 50% and 100%. *See Webster's Third International Dictionary* 799 (1961) (defining "expect" as "to consider probable or certain").

*Id.* at 1265.

As noted previously, Ehrsam cannot attach any degree of certainty to a finding that any uppercase KPT drywall impacted Plaintiffs' properties. He admits that inspection is the only way to determine whether an item has been impacted by drywall-related corrosion. There is a reasonable fear that a jury may be overly influenced by Ehrsam's qualifications, which Plaintiffs' tout proudly in their response. Moreover, Plaintiffs have failed to establish or argue in more than a conclusory fashion that Ehrsam's opinions are either reliable or relevant to the individual Plaintiffs' cases.

For these reasons, the Undersigned **grants** Defendants' request to exclude Ehrsam's expert testimony.

b. <u>Shawn Macomber</u>

Shawn Macomber is a defective drywall consultant and remediator. He inspected Plaintiffs' properties for the presence of corrosive drywall and was retained to provide expert opinions on the following topics: (A) the under-air and gross square footage for each affected property; (B) the presence of defective Knauf-manufactured drywall in the living space of a property; (C) the projected cost of remediation for each property utilizing the court-endorsed RS Means[6] formula method; (D) identifying the custom-built homes that would not be suitable for projecting the cost of remediation using the RS Means method; (E) determine whether a plaintiff/former home owner whose home was foreclosed or who sold via a short sale provided pictures of defective Knauf-manufactured drywall markings from their homes; and (F) provide an opinion regarding what is meant by "complete remediation of the home" based on his experience as an inspector and/or contractor engaged in remediation of Chinese drywall homes. [ECF No. 64-3].

---

[6]      "RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country." *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 205 (E.D. Pa. 2014). It is "a long-accepted tool for construction cost calculation, and its use as the starting point for calculating damages is widespread and accepted." *Gulbankian v. MW Mfrs., Inc.*, No. CIV.A. 10-10392-RWZ, 2014 WL 7384075, at *5 (D. Mass. Dec. 29, 2014).

*i. Economic Loss Rule*

Defendants first challenge the relevancy of Macomber's opinions based on the economic loss rule. This rule, Defendants say, renders many of Macomber's opinions irrelevant because, according to Defendants, "damages in the form of 'costs of inspection,' 'costs and expenses necessary to fully remediate or abate their home,' 'lost value or devaluation of their home,' 'cost of alternative living arrangements,' 'stigma damages,' or 'loss of use and enjoyment of their home and property' are disallowed under Florida law." [ECF No. 64].

Plaintiffs respond by accusing Defendants of failing to disclose to the Court "that the Chinese drywall MDL court has already ruled that Florida law allows homeowners to proceed with tort claims, based on Florida law." [ECF No. 73]. They say that the MDL court compared the damage caused by Chinese drywall to that caused by asbestos and determined that because the economic losses were not barred in the asbestos tort claims, there "exist [sic] the same bases for allowing tort claims for economic losses in the [Chinese Drywall Litigation]." *Id.* (citing *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 680 F. Supp. 2d 780, 798 (E.D. La. 2010)).

Plaintiffs' accusation against Defendants for failing to disclose this ruling rings hollow. Approximately one month before Plaintiffs filed their response, Judge Scola entered an Order ruling that the economic loss rule applies to the Related Cases and

holding that Plaintiffs' "strict liability [claims] are . . . viable against [Defendants],
provided that . . . they seek damages that are not precluded by the economic loss rule."
[ECF No. 58]. In another ruling issued before Plaintiffs' response, Judge Scola held that
"[b]ecause [*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Co.*, 110 So. 3d 399, 401 (Fla.
2013)] explicitly disallowed the recovery of economic losses in the products liability
context and FDUTPA only allows for the recovery of economic losses, the Plaintiffs'
FDUTPA claims must fail as a matter of law in this products liability case." [ECF No. 70].
Thus, this Court has **already determined that the economic loss rule applies.**

The mere fact that some of Plaintiffs' claims remain viable -- to the extent they seek
damages not precluded by the economic loss rule -- does not mean that all testimony
about damages to the property or the cost of remediating the property is admissible.
Instead, for damages testimony to be relevant, it must concern damages not precluded
by the economic loss rule. On this point, Plaintiffs' response offers very little.

Plaintiffs argue that "the damage inflicted on Plaintiffs' home goes beyond injury
to the product itself." [ECF No. 73]. Although it is true that part of Plaintiffs' theory of
recovery is that the defective drywall has injured Plaintiffs' personally and has injured
their personal property [ECF No. 5, ¶ 21], Macomber's opinions do not address these non-
product injuries.

In determining whether certain property qualifies as "other property" and falls

**outside** the economic loss rule's prohibition (which means the claim is still viable), courts have applied the "integration" or "component part" analysis, finding that if a defective component is integrated into a product, the product is not considered "other property." *See, e.g., Turbomeca, S.A. v. French Aircraft Agency, Inc.*, 913 So. 2d 714, 717 (Fla. 3d DCA 2005) ("Courts have refused to bifurcate products into parts where a component part harms or destroys the final product."); *Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, No. 06-20624-CIV, 2006 WL 8432715, at *5 (S.D. Fla. Dec. 20, 2006) ("Florida law has long held that when a component part harms or destroys a finished product, the finished product does not satisfy the 'other property' exception.").

The Florida Supreme Court's discussion in *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244 (Fla. 1993) is instructive on how to evaluate the economic loss rule in the context of homes. In *Casa Clara*, the court rejected the plaintiff's argument that damage to other parts of the home caused by defective concrete constituted damage to other property, explaining that "[t]he character of a loss determines the appropriate remedies, and, to determine the character of a loss, one must look to the product purchased by the plaintiff, not the product sold by the defendant." *Id.* at 1247 (citing *King v. Hilton–Davis*, 855 F.2d 1047 (Fla. 3d DCA 1988); *but see Boracayan del Sur, S.A. v. Vidco Indus. Inc.*, No. 05-21948-CIV-JORDAN, 2007 WL 9700684, at *3 (S.D. Mar. 22, 2007) (holding that damage to the home constituted damage to other property

21

when it was caused by the fresh installation of windows in an already constructed home).

Here, Plaintiffs implicitly concede this principle in their response, acknowledging that, "[f]or those homeowners that purchased after the drywall was installed, the completed residential structure with all included components constituted the 'product.'"

As stated previously, Macomber's opinion assesses the cost of a full remediation to the home -- i.e., the damage to the product itself. In Macomber's expert report, he says that he adopts the definition of remediation as defined in Judge Fallon's "Findings and Fact & Conclusions of Law Related to the June 9, 2015 Damages Hearing.". In this ruling, Judge Fallon adopts the scope of remediation as defined in *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010). [ECF No. 73-1]. *In re Chinese Drywall* states that proper remediation requires "the removal of all drywall, all electrical wiring, the entire HVAC system, and many other items such as appliances, carpet, cabinetry, trim work and flooring." 706 F. Supp. 2d at 671.

Based on the *Casa Clara* Court's definition of a home as a product, appliances are the only items included in Judge Fallon's required remediation which would qualify as "other property." Notably, Macomber's calculations do not include appliances in his analysis of the cost of remediation. [ECF No. 64-7 (including as part of his RS Means calculation the cost of remediating flooring, masonry, ceilings, HVAC, plumbing, electrical, etc.)]. Therefore, the damages for which Macomber offers an opinion are only

those Plaintiffs are *precluded from recovering* under the economic loss rule. Plaintiffs have

offered no specific argument or explanation for which parts of Macomber's opinions, if

any, fall outside the proscriptions of the economic loss rule.

For these reasons, the Undersigned **grants** Defendants' request to exclude

Macomber's testimony. His opinion is irrelevant because he seeks to opine only on

damages which Plaintiffs may not recover under the economic loss rule.

*ii.  Reliability of Macomber's opinion*

Defendants also raise two challenges to the reliability of Macomber's opinions.

First, Defendants contend that there are analytical flaws in Macomber's opinions. Second,

Defendants argue that the RS Means method is an inappropriate way to calculate

remediation. The Undersigned will address these points in turn.

1.  <u>Analytical Flaws</u>

In Macomber's expert report, he says that he and his staff have visited all homes

requested by Plaintiffs' counsel and, from these visits, he generated his data, which

includes a summary of his findings in letter form for each property, which are attached

as Exhibit C. [ECF No. 64-3]. In the "conclusions/opinions" section of his report,

Macomber states:

> The presence of defective Knauf-manufactured drywall was found in the
> living space of all properties visited by [him and his staff]. A summary
> report/letter was generated for each property visited and **includes the**
> **location of the defective Knauf-manufactured drywall, a picture of the**

23

**markings on the Knauf drywall**, and a square footage calculation. Those summaries are attached hereto as Exhibit C.

*Id.* (emphasis added).

Defendants included Macomber's letters as an attachment to their motion. [ECF No. 64-4]. Defendants argue that Macomber's opinions are speculative and unreliable, in part, because the information contained in his letters is either lacking or incorrect. Defendants note that in several of the inspection letters, Macomber does not include the location in the home of the KPT drywall. This issue, Defendants say, is compounded by the fact that the letters often contain pictures which do not correspond with the home which was purportedly inspected.

Plaintiffs ignore these arguments in their response, which is sufficient grounds alone to grant Defendants' request. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.").

Moreover, Defendants' argument has merit. Macomber included 24 inspection letters as Exhibit C. [ECF No. 64-3]. Despite stating in his expert report that his letters will include the location of defective drywall, there are thirteen instances where the location of the drywall was left blank. *Id.* at pp. 1, 5, 7, 9, 11, 13, 17, 21, 25, 31, 37, 45, 47. To compound this problem, Macomber's photographic evidence (i.e., a picture of the

24

markings on the Knauf drywall) frequently does not match the purportedly inspected

property:

| Address of Allegedly Inspected Property | Street Address of Photograph |
| --- | --- |
| 3310 NE 3 Dr., Homestead, FL 33033 [ECF No. 64-3, p. 1] | 9461 [ECF No. 64-3, p. 2] |
| 8220 SW 60 Court, South Miami, FL 33143 [ECF No. 64-3, p. 5] | 9461 [ECF No. 64-3, p. 6] |
| 3441 SW Haines St., Port St. Lucie, FL 34953 [ECF No. 64-3, p. 7] | 9461 [ECF No. 64-3, p. 8] |
| 363 NE 30 Ave., Homestead, FL 33033 [ECF No. 64-3, p. 9] | 9461 [ECF No. 64-3, p. 10] |
| 22079 SW 88th Path, Cutler Bay, FL 33190 [ECF No. 64-3, p. 11] | No address but contains two photos which are edited to say "Bedroom 2 Closet" and "Bedroom 3" [ECF No. 64-3, p. 12] |
| 1402 O'Donnell Lane SE, Port. St. Lucie, Fl 34983 [ECF No. 64-3, p.13] | 9461 [ECF No. 64-3, p. 14] |
| 12176 SW 49th Ct., Cooper City, FL 33330 [ECF No. 64-3, p. 15] | No address but contains two photos which are edited to say "Bedroom 2 Closet" and "Bedroom 3" [ECF No. 64-3, p.16] [These photographs are identical to the photographs included with the 22079 SW 88th Path letter] |
| 10769 NW 81 Ln, Doral, FL 33178 [ECF No. 64-3, p. 17] | 9461 [ECF No. 64-3, p. 18] |
| 1743 Olivia Dr. Avon Park, FL 33825 [ECF No. 64-3, p. 21] | 9461 [ECF No. 64-3, p. 22] |
| 23205 SW 217 Ave., Miami, FL 33031 [ECF No. 64-3, p. 25] | 9461 [ECF No. 64-3, p. 26] |
| 1722 NE 6th St., Boynton Beach, FL 33435 [ECF No. 64-3, p. 31] | 9461 [ECF No. 64-3, p. 32] |
| 5952 SW 102 St., Pinecrest, FL 33156 [ECF No. 64-3, p. 37] | 9461 [ECF No. 64-3, p. 38] |

| 14763 SW 35 Lane, Miami, FL 33185 [ECF No. 64-3, p. 45 | 9461 [ECF No. 64-3, p. 46] |
|---|---|
| 4331 Ferrari Dr., Sebring, FL 33872 [ECF No. 64-3, p. 47] | 9461 [ECF No. 64-3, p. 48] |

Thus, 14 of the 24 inspected properties all used the same two sets of pictures as proof of the existence of defective drywall in the property.

"[T]rial judges are afforded 'considerable leeway' in ascertaining whether a particular expert's testimony is reliable." *Easterwood v. Carnival Corp.*, No. 19-CV-22932, 2020 WL 6880369, at *2 (S.D. Fla. Nov. 23, 2020). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, Fla., 402 F.3d 1092, 1111 (11th Cir. 2005)).

These *obvious* errors in Macomber's letters leave the Court with little confidence in the reliability of his opinions. There are questions over whether Macomber or his team ever actually inspected the subject properties, whether his notes concerning each property are the actual results from the inspection of that property (and not some *other* property), whether he discovered defective drywall in certain properties, or whether the drywall was located where he said it was located (if he even actually recorded where it was located).

Plaintiffs partially address this point by arguing that selective remediation is not

an option, so it does not matter where the defective drywall was located. However, this argument does not address the fundamental problem with Macomber's opinions:

Macomber used the same set of photographs of a home with the street address "9461" in twelve different inspection letters, none of which were in reference to a home with that street address. Thus, it can be certain that at least half of Macomber's inspection letters contain blatant errors. Plaintiffs could have tried to address this flaw by requesting an evidentiary hearing or by including a declaration or affidavit explaining the error. Plaintiffs did not attempt either of those options -- they simply ignored the argument in their response.

At bottom, Macomber's opinions are built on an inadequate factual foundation and there is real fear that a jury could be misled by his unreliable testimony. For these reasons, the Undersigned **grants** Defendants' motion to exclude Macomber's testimony as unreliable.

### 2.   Reliability of RS Means method

Defendants also challenge the reliability of the RS Means method, stating that it offers no property-specific information and "merely assumes that if one were to build a new home in a particular county/city, because the RS Means provides an approximate total cost to completely perform that construction, that figure is the amount that would be required to remediate Plaintiffs' properties." [ECF No. 64]. As a secondary argument,

Defendants contend that Macomber admitted that the method was unreliable when applied to custom homes and a more-exacting method should be used to determine the cost of remediation.

As Plaintiffs note in their response, the MDL court "found the RS Means method for estimating the cost of repair of Chinese drywall homes to be, 'a generally accepted method of calculating building costs.'" [ECF No. 73 (quoting [ECF No. 73-1])]. They say that because full remediation is necessary when there is defective drywall present, using the RS Means method to assess the cost of remediating the entire property is appropriate.

The Court's gatekeeper role is not intended to supplant that of the jury: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Allison*, 184 F.3d at 1311 (quoting *Daubert*, 509 U.S. at 596) (alterations in original). "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

Defendants' arguments against the RS Means method do not sufficiently undermine its reliability. As with Defendants' secondary argument concerning its applicability to custom homes, Defendants take issue more with the conclusion than they

28

do with the actual methodology. In each situation, Defendants challenge whether the damages number is accurate. The Undersigned does not find that this challenge is a sufficient independent basis to *exclude* Macomber's opinions at trial.

### iii.  Already-Remediated Homes

Defendants' final challenge is that Macomber's opinion about the cost of a full remediation should be excluded from three of the Related Cases in which the Plaintiffs have already self-remediated.[7] [ECF No. 64]. Plaintiffs argue that the MDL court has held that every home containing defective drywall is entitled to a full remediation. [ECF No. 73]. In reply, Defendants say that the homes were already fully remediated and, thus, Macomber's opinion on the issue is irrelevant.

As with Defendants' other argument concerning the RS Means method, this issue is better left for cross examination. If Macomber were being permitted to present his opinion (which he is not), then this issue would not serve as an independent ground to strike his testimony.

## III.   CONCLUSION

Based on the foregoing, the Undersigned grants Defendants' *Daubert* Motion and excludes for trial purposes both Ehrsam's and Macomber's opinions as irrelevant and

---

[7]      The three cases are: *Ruben Dapena o.b.o. Annetta, LLC & Baco Annetta, LLC*, Case No. 21-cv-24211; *Santiago Guzman o.b.o. Skyline Glass, LLC*, Case No. 21-cv-24202; and *Daniel Blonsky, et al.*, Case No. 21-cv-24214.

unreliable.

      **DONE AND ORDERED** in Chambers, in Miami, Florida, on November 2, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola
All Counsel of Record